___ FILED        ___ LODGED
___ RECEIVED     ___ COPY

MAR 0 7 2007

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY
REDACTED FOR
PUBLIC DISCLOSURE

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR07 - 260 PHX·DGC (ECV) |
| Plaintiff, | |
| v. | **I N D I C T M E N T** |
| 1. David Goldfarb, (Counts 1-33) | VIO:  18 U.S.C. §§1341 & 2 (Mail Fraud and Aiding & Abetting) Counts 1-18 |
| 2. Richard Ross, (Counts 1-33) | 18 U.S.C. §371 (Conspiracy) Count 19 |
| 3. Paul Woodcock, (Counts 1-33) | |
| 4. Milton Guenther, (Counts 1-33) | 18 U.S.C. §§1956(a)(1)(A)(i) & 2 (Promotional Money Laundering and Aiding & Abetting) Counts 20-27 |
| 5. James Bonebrake, (Counts 1- 19, 21, 24) | |
| 6. Raymond Marshall, (Counts 1- 19, 20, 27) | 18 U.S.C. §§1957(a) & 2 (Transactional Money Laundering and Aiding & Abetting) Counts 28-33 |
| 7. Brian Ongaro, (Counts 1- 19, 20, 27) | |
| 8. Michael Nibler, (Counts 1- 19, 22, 26) | 18 U.S.C. §982(a)(1) (Criminal Forfeiture) |
| 9. Colin McHale, (Counts 1- 19, 23, 25) | |
| Defendants. | |

THE GRAND JURY CHARGES:

At various times relevant herein:

**INTRODUCTION:**

1. CORF stands for Comprehensive Outpatient Rehabilitation Facility. Authorized by Congress in 1981, as recognized by 42 CFR 485.50, a CORF is a non-residential public or private facility primarily engaged in providing diagnostic, therapeutic and restorative services to outpatients for the rehabilitation of injured, disabled or sick persons, by and under the supervision of a physician. To operate a CORF and qualify for Medicare reimbursements, it must comply with various federal and state regulations.

2. CORF Licensing Service, LP, (hereafter "CLS") was an Arizona limited partnership located in Maricopa County where it conducted its principal business. It filed its Certificate of Limited Partnership with the Arizona Secretary of State in January 2000.  CORF Licensing Services, LLC, a Delaware Limited Liability Company was listed as the general partner. For a fee, CLS was to assist clients in establishing a CORF by helping select a medical director and facility site, see that the facility met certain federal and state specifications, help staff and train employees, assist the client in obtaining medicare certification and meeting state licensing requirements among other things.  CLS marketed its services through newspapers, website and seminars. Pulmonary respiratory therapy was one of the primary rehabilitation services marketed by CLS as a source of revenues for prospective CORF owners.

3. CORF Management Services, LP (hereafter "CMS"), was an Arizona limited partnership located in Maricopa County where it conducted its principal business. It filed its Certificate of Limited Partnership with the Arizona Secretary of State in January 2000. CORF Licensing Service, LLC, a Delaware corporation was listed as the general partner. CMS was in the business of providing various management services to the CORFs, including billing, record keeping, training, budgeting, collections and other related services. CMS provided the management services in exchange for 17% of the revenues it collected on behalf of a CORF.

## DEFENDANTS

4. Defendant DAVID GOLDFARB ("GOLDFARB") was founder, part owner and President of CLS and CMS.

2

1    5. Defendant PAUL WOODCOCK ("WOODCOCK") was founder and part-owner of
2  CLS and CMS.

3    6. Defendant RICHARD ROSS ("ROSS") was founder, part owner and Chief Financial
4  Officer of CLS and CMS.

5    7. Defendant MILTON GUENTHER ("GUENTHER") was founder, part owner and Chief
6  Operations Officer of CLS and CMS.

7    8. Defendant JAMES BONEBRAKE, ("BONEBRAKE") owned and operated a CLS
8  sponsored CORF in Joliet, Illinois, the Joliet Rehab Center ("JOLIET"). On or about March 14,
9  2000, defendant BONEBRAKE entered into a Licensing Service Agreement with CLS and was
10 Medicare certified and open for business around January 2001.

11   9. Defendant RAY MARSHALL ("MARSHALL") and a partner of RMBO Enterprises,
12 LP ("RMBO"), owned and operated two CLS sponsored CORFs in Texas. On or about January
13 2001, RMBO entered into a Licensing Service Agreement with CLS for two CORFs and was
14 certified and open for business around September 2001.

15   10. Defendant BRIAN DAVID ONGARO ("ONGARO") and a partner of RMBO
16 Enterprises, LP, owned and operated two CLS sponsored CORFs in Texas. On or about January
17 2001, RMBO entered into Licensing Service Agreement with CLS for two CORFs and was
18 certified and open for business around September 2001.

19   11. Defendant COLIN McHALE ("McHALE") and a partner of RVC, Inc. ("RVC"), owned
20 and operated Ocean Therapy Center, ("Ocean Therapy"), a CLS sponsored CORF, in California.
21 On or about October 2000 RVC entered into a Licensing Service Agreement with CLS and was
22 certified and open for business around August 2001.

23   12. Defendant MICHAEL NIBLER ("NIBLER") and a partner, owned and operated
24 Northstar Therapy Center, LP, ("Northstar"), a CLS sponsored CORF, in Washington.  On or
25 about December 2000, Northstar entered into a Licensing Service Agreement with CLS and was
26 certified and open for business around August 2001. In or around December 2001,  defendant
27 NIBLER's partner terminated his business relationship with him and later expelled him from

28                                    3

1  Northstar.

2  ## OVERVIEW OF CLS OPERATION

3  13. From on or about January 2000 through June 2003, CLS contracted to establish CORFs
4  with approximately 300+ licensees. In 2000, it contracted with approximately 45 licensees; in
5  2001, approximately 154 licensees; in 2002, approximately 162 and in 2003, approximately 10.

6  14. From January 2000 through June 2003, less than half of the licensees' CORFs reached
7  certification and/or become operational. Those that did, did not collect the revenues or generate
8  the profits that they were told to expect. Most, if not all, were unprofitable.

9  15. Over this span of time, CLS received approximately 40 million dollars from licensees.

10  ## COUNTS 1-18

11  ## SCHEME TO DEFRAUD

12  16. That beginning on or about May 1, 2001 and continuing through June 2003, within the
13  District of Arizona and elsewhere, the defendants GOLDFARB, ROSS, WOODCOCK,
14  GUENTHER, individually and as owners and agents of CLS along with defendants
15  BONEBRAKE, MARSHALL, ONGARO, NIBLER and McHALE and others, aiding and
16  abetting each other, knowingly devised and intended to devise a scheme and artifice to defraud
17  victim licensees, and to obtain money from them by means of materially false and fraudulent
18  pretenses, promises and representations, knowing them to be false or with reckless indifference
19  to their truth or falsity and the knowing concealment of material facts.

20  ## OBJECT OF THE SCHEME TO DEFRAUD

21  17. Defendants knowingly and intentionally misrepresented the success and profitability of
22  owning a CORF to induce victim-licensees to pay substantial fees to CLS to assist them in
23  establishing their own CORFs and to enrich themselves to the detriment of the victim-licensees.

24  ## MEANS AND METHODS

25  In carrying out the scheme, defendants made the following false misrepresentations    ,
26  knowing them to be false or with reckless indifference to their truth or falsity and concealed
27  material facts as well as knowingly engaging in the following deceptive acts, practices and

28                                                                      4

1  devices, among others:

2  18. From January 2000 through June 2003, when CLS ceased to do business and filed
3  bankruptcy, defendants GOLDFARB, ROSS, WOODCOCK and GUENTHER as owners,
4  officers and agents of CLS were in the business of assisting licensees to establish CORFs.

5  19. For a fee ranging anywhere from $100,000 to $165,000 per CORF, CLS entered into
6  a "Licensing Service Agreement"with clients which obligated CLS to help them do the
7  following: select an appropriate site and negotiate a  lease, suggest a layout that complied with
8  federal, state and local building codes, identify and present clients with candidates for key CORF
9  positions such as medical director, administrator and therapists, provide billing and other training
10  to them, prepare a CORF policy and procedure manual as required by federal law, and help
11  client-licensees prepare an application to become a participating provider under Medicare and
12  under any and all other federal and state licenses and permits necessary to own and operate a
13  CORF.

14  20. Defendants GOLDFARB, ROSS, WOODCOCK and GUENTHER through CMS  also
15  entered into a "Support Service Agreement" with CORF owners. Under the terms of this
16  contract, CMS was to provide management services to owners of CORFs, including billing,
17  record keeping, training, budgeting, collections, and other related services. In exchange for these
18  services, CMS was to receive 17% of their actual billing revenues.

19  21. In order to attract clients, defendants GOLDFARB, ROSS, WOODCOCK and
20  GUENTHER as CLS ran ads in newspapers and magazines that stated a CORF owner could
21  expect to generate a profit ranging from $300,000 to $450,000 within the first year. Some
22  advertisements referred prospects to a CLS website for further information.

23  22. The CLS website described in more detail the benefits of owning and operating a
24  CORF. In line with the ads, the website also stated that a CORF owner could expect to earn a
25  profit ranging from $300,000 to $450,000. Also, according to the website, the costs of
26  establishing a CORF ranged from approximately $300,000 to $350,000. The website listed
27  CLS's phone numbers and prompted those who could afford the licensing fee to call CLS.

28

23. Defendants GOLDFARB, ROSS, WOODCOCK and GUENTHER knew the proclamations of profits in the ads and website were overstated or made with reckless indifference to their truth or falsity and that the start up costs were understated or made with reckless indifference to their truth or falsity, yet continued to utilize these ads and website.

24. CLS invited prospective licensees who had seen the ads and/or viewed the website or heard about it and were interested in further exploring the benefits of establishing a CORF to seminars which it staged almost monthly from May 2001 through April 2003. These seminars were conducted by defendants GOLDFARB, ROSS, WOODCOCK and GUENTHER, and on occasion defendant BONEBRAKE, among others, for the purpose of defrauding prospective investors.

25. At these seminars and elsewhere, defendants GOLDFARB, ROSS, WOODCOCK and GUENTHER, and on occasion defendant BONEBRAKE, among others, touted a business model for owning and operating a CORF which they knew was not viable yet made the following material representations, knowing them to be false or with reckless indifference to their truth or falsity, including but not limited to the following:

(a.) That it took approximately six months from the date of signing the Licensing Service Agreement with CLS to find a facility, negotiate and sign a lease, build out the facility, organize the company, hire staff, develop facility documentation, become Medicare licensed and see patients;

(b.) That the start-up cost for a CORF to become licensed was approximately $350,000 including the fee paid to CLS;

(c.) That a CORF owner could expect earnings or profit ranging from $300,000 to $450,000 the first year and more in subsequent years;

(d.) That a CORF owner could expect to collect revenues in excess of $1,000,000 each year;

(e.) That CLS had lined up or would line up medical directors who could refer sufficient

6

patients to render the licensees' operations profitable;

(f.) That CLS had the expertise and infrastructure to see that CORF owners would be certified in approximately six months and profitable within the first year and was committed to this goal;

(g..) That CLS had a grand plan to "roll-up" and sell the individual CORFs to a corporate buyer for a multiple (generally expressed at eight or nine times) of their combined pre-tax annual profits when they reached a certain point which was imminent, thereby conveying the impression that a number of CLS sponsored CORFs were up and running and were profitable and that a new licensee could anticipate reaping greater profits in the near future;

(h.) That CLS had decided not to conduct any more seminars and to stop soliciting new licensees so that interested parties should act fast;

(i.) That CLS would provide a "turn-key" operation requiring little or no hands-on management by the owners;

(j.) That the business model touted by CLS was viable and that most licensees who followed it were profitable.

26. At the seminars, defendants GOLDFARB, ROSS, WOODCOCK and GUENTHER as CLS provided attendees pro forma projections memorializing and quantifying many of the aforementioned misrepresentations. Defendants well knew that these pro forma projections had no basis in fact and were misleading in various material ways including, but not limited to, the following:  the costs required to establish a CORF, the number of patients and patient-visits a CORF owner could anticipate, the amount reimbursable by Medicare and other sources for the services rendered , and the collected gross revenue and net profit one could expect to generate in the first year and subsequent years, because from CLS's inception in 2000, few, if any, CLS sponsored CORFs approached these figures.

27. Nonetheless, at the seminars and elsewhere, defendants GOLDFARB and ROSS, and others, falsely assured prospective-licensees that the projections had some basis in fact and

reality, telling them that the projections were based on "the experiences of current CLS owners," and/or were "conservative" and/or the "worst case scenario," intending to create the impression that most CLS sponsored CORFs were meeting or exceeding the projections.

28. In some instances, defendants, particularly ROSS and GOLDFARB, as well as other employees of CLS, told prospective-licensees, within the context of a seminar and other efforts to promote CLS and attract clients, that the projections were based on the experience of "existing CORFs" intending them to believe said numbers were derived from CLS sponsored CORFs and not a few unrelated CORFs, as later alleged by defendant ROSS; a fact, if it were true, was intentionally omitted.

29. During the seminar and elsewhere, defendants GOLDFARB, ROSS, WOODCOCK and GUENTHER, as well as other agents of CLS, regularly assured potential licensees that all but a few CLS sponsored CORFs in operation had been successful and profitable and/or were on target to meet or exceed the projections; whereas, said defendants knew that few CORFs, if any, approached the projections,  that in the latter part of 2001 and early part of 2002, CLS made loans and refunds to a number of CORFs experiencing cash flow problems and delays, in part to ward off lawsuits, and that a substantial number of licensees never reached the stage of being Medicare certified and/or operational and failed to disclose this information to licensees along with other material facts.

30. As part of the scheme, prospective licensees were encouraged by CLS, primarily defendant GOLDFARB, to conduct an "independent investigation" and speak with other CORF owners in order to verify its representations prior to signing a Licensing Agreement.

31. In furtherance of the scheme, defendants GOLDFARB, ROSS, WOODCOCK and GUENTHER, capitalized on the licensees' efforts to conduct an independent investigation and further deceived them by referring them to defendants BONEBRAKE, MARSHALL, ONGARO, NIBLER and McHALE, whom CLS paid to act as pitchmen to verify CLS' claims and misrepresentations.

32. It was a critical part of the scheme that defendants GOLDFARB, ROSS, WOODCOCK

8

and GUENTHER as well as defendants BONEBRAKE, MARSHALL, ONGARO, NIBLER and McHALE purposely failed to disclose their fee arrangement intending prospective-licensees to believe that they had received unbiased accounts with regard to owning and operating a CORF established through CLS from defendants BONEBRAKE, MARSHALL, ONGARO, NIBLER and McHALE.

33. By failing to disclose the fee arrangement, defendants undermined the licensees' attempts at due diligence and foreclosed and curtailed the possibility of the learning from truly independent CORF owners or other sources that most, if not all, CLS sponsored CORFs were not meeting the projections, were suffering delays, cost overruns and other problems.

34. In addition to failing to disclose payments from CLS, defendants BONEBRAKE, MARSHALL, ONGARO, NIBLER and McHALE verified the misrepresentations and claims of the defendants GOLDFARB, ROSS, WOODCOCK and GUENTHER with false statements and/ or half-truths conjuring up an image of success and profitability by omitting material facts that would have indicated otherwise. For example, said defendants falsely represented that they were profitable and/or that they had met the projections or were on track to meet or exceed them and/or were profitable or had met the projections for a certain period of time, suggesting they were currently profitable, whereas they were not. Defendants intentionally failed to disclose to the licensees that aside from the fees received from CLS, they were not meeting the projections and were unprofitable.

35. Defendants GOLDFARB, ROSS, WOODCOCK and GUENTHER knew that defendants BONEBRAKE, MARSHALL, ONGARO, NIBLER and McHALE were providing false testimonials to prospective licensees in order to generate sales and to undermine their ability to conduct an independent investigation which would have revealed that CLS's business model was not as represented.

36. From on or about January 2001 to January 2003, defendants GOLDFARB, ROSS, WOODCOCK and GUENTHER through CLS paid defendant BONEBRAKE approximately $500,000.

9

37. From on or about September 2001 to January 2003, defendants GOLDFARB, ROSS, WOODCOCK and GUENTHER through CLS paid defendant McHALE approximately $330,000.

38. From on or about May 1, 2001 to January 2003, defendants GOLDFARB, ROSS, WOODCOCK and GUENTHER through CLS paid defendants MARSHALL and ONGARO approximately $750,000.

39. From on or about November 2001 to September 2002, defendants GOLDFARB, ROSS, WOODCOCK and GUENTHER through CLS paid defendant NIBLER approximately $160,000.

40. From on or about January 2000 through December 2002, defendants GOLDFARB, ROSS, WOODCOCK and GUENTHER received approximately $40 million dollars to the detriment of the licensees. From this amount, defendant GOLDFARB received approximately $3.5 million, defendant ROSS received approximately $2 million, defendant WOODCOCK approximately $4 million and defendant GUENTHER over a $1 million.

41. From about March 2002 through February 2003, defendants GOLDFARB, ROSS, WOODCOCK and GUENTHER also invested approximately $1,000,000 in a venture called "Aztec Medical." This was in addition to the sums specified above.

42. Defendants' scheme to defraud was ongoing. They continued to solicit new licensees by knowingly and intentionally misrepresenting the quality of CLS services, understating the costs and risks associated with establishing a CORF and overstating the patient activity, the collectible income and the likelihood of generating a profit, among other items, through ads, the internet, seminars, statements and the use of paid referrals until they ceased to do business in June 2003.

43. On or about the dates set forth below, in the District of Arizona and elsewhere, for the purpose of executing the above described scheme to defraud, and attempting to do so, defendants caused the following items to be placed in an authorized depository for mail matter and to be sent and delivered by the U.S. Postal Services or caused the following items to be deposited and

sent or delivered by a private or commercial carrier according to the directions thereon:

| COUNT | DATE | ITEM MAILED |
|-------|------|-------------|
| 1 | May 22, 2002 | Carl Betcher received a letter from CLS with Licensing Service Agreement enclosed and request for payment |
| 2 | May 22, 2002 | Carl Betcher returned to CLS a Licensing Service Agreement and check payable to CLS in the amount of $165,000. |
| 3 | May 30, 2002 | Ted Buck received a letter from CLS with Licensing Service and Support Service Agreement enclosed and request for payment. |
| 4 | May 30, 2002 | Ted Buck returned to CLS the Agreements and a check for $165,000. |
| 5 | June 21, 2002 | Greg Hughes received a letter from CLS with Licensing Service Agreement and Support Service Agreements enclosed and request for payment. |
| 6 | June 21, 2002 | Greg Hughes returned to CLS a Licensing Service Agreement and Support Service Agreement and check payable to CLS for $247,000. |
| 7 | August 7, 2002 | Ted Goodman received a letter from CLS with Licensing Service Agreement and Support Service Agreement enclosed and request for payment. |
| 8 | August 7, 2002 | Ted Goodman returned to CLS three checks payable to CLS for $247,000. |
| 9 | December 20, 2002 | Howard Moore received a letter from CLS with Licensing Service and Support Service Agreements enclosed and request for payment. |
| 10 | February 14, 2003 | Paul Colburn received a letter from CLS with Licensing Service Agreement enclosed and request for payment. |
| 11 | July 2002 | Dorn Rademacher received a letter from CLS with Licensing Service and Support Service Agreement enclosed and request for payment. |
| 12 | July 2002 | Dorn Rademacher returned to CLS a check payable to CLS in the amount of $165,000. |
| 13 | August 5, 2002 | Jay Hinrichs received a letter from CLS with Licensing Service and Support Service Agreements enclosed and request for payment |
| 14 | August 5, 2002 | Jay Hinrichs returned to CLS a check payable to CLS for $82,500. |
| 15 | October 28, 2002 | Ed Rooks received a letter from CLS with Licensing Service Agreement and Support Service Agreement enclosed and request for payment. |

11

| 16 | October 30, 2002 | Ed Rooks returned to CLS a signed Licensing Service and Support Service agreements and a check payable to CLS in the amount of $165,000. |
| 17 | September 2002 | Scott Wagman received a letter from CLS with Licensing Service and Support Service Agreements enclosed and request for payment. |
| 18 | October 2, 2002 | Scott Wagman returned to CLS signed Agreements and a check payable to CLS for $247,500. |

All in violation of Title 18, United States Code, Section 1341 and 2.

## COUNT 19

## CONSPIRACY

The Grand Jury incorporates by reference paragraphs 1- 42 of the Indictment.

44. That beginning on or about May 2001 and continuing through May 2003, within the District of Arizona and elsewhere, the defendants GOLDFARB, ROSS, WOODCOCK, GUENTHER, BONEBRAKE, MARSHALL, ONGARO, NIBLER and McHALE, with persons both known and unknown to the grand jury, did conspire, confederate and agree together and with each other to commit violations of the following offenses against the United States:

a. To knowingly devise and participate in, and execute a scheme to defraud the licensees-investors and to obtain money and property from them by means of false and fraudulent pretenses, representations and promises and the concealment of material facts, and by causing the use of the United States mail or private and commercial interstate carriers for the purpose of executing such scheme to defraud in violation of Title 18, United States Code, Section 1341.

b. To conduct financial transactions with proceeds from the mail fraud for the purpose of promoting or carrying on the fraudulent scheme in violation of Title 18, U.S.C. Sec. 1956(a)(1)(A)(i).

## OVERT ACTS

45. In furtherance of the conspiracy, defendants committed one or more of the following overt acts, among others:

12

**ADS:**

(1.)  On or about August 2001, CLS ran an ad in "Fortune" magazine which asked the reader if he "Would Be Comfortable Earning $410,000?"

(2.)  On or about February 2002, CLS ran an ad in "Money" magazine which proclaimed that an investor could "Earn $350,000 1st Year?" and "Earn $2,000,000+ After 2 Years on Anticipated Acquisition?"

(3.)  On or about October 2002, CLS ran an ad in "Money" magazine which proclaimed "$450,000 1st  year profit" and "$2,000,000+ after two years."

(4.)  On or about November 18, 2002, CLS ran an ad in "Business Week" which proclaimed "$450,000 1st year profit" and "$2,000,000+ after two years."

(5.)  On or about September 2002, CLS ran an ad in "Business Week" which proclaimed "$450,000 profit in the first year" and "$2,000,000+ 2nd Year Buyout."

**CLS WEBSITE:**

(6.)  On or about July 2001, CLS's website specified a model that anticipated $2,000,000 first year gross with pre-tax Net Profit in excess of $400,000.

(7.)  On or about January 2002, CLS's website stated that its model anticipated pre-tax Net Profit in excess of $400,000.

(8.)  On or about September 2002, CLS's website declared under its model every new CORF owner is expected to pre-tax net at least $400,000 to $500,000 after start up.

(9.)  On or about December 2002, CLS's website states that more than $400,000-$500,000 annual income for each facility is anticipated.

**VICTIMS: SEMINARS/MISREPRESENTATIONS/ PROJECTIONS /MAILINGS**

**Karl Buhl:**

(10.)  During the course of a seminar on or about August 24, 2001, defendant GOLDFARB told the attendees, including Karl Buhl, that a CORF licensee could anticipate a net profit in year one ranging from $300K to $400K and in year 2: $500-600K.

(11.)  Around the same date of the seminar in August 2001, defendant    ROSS told Karl

13

Buhl that the projections were based on actual numbers from operating CORFs.

(12.) On or about August 28, 2002, Karl Buhl signed the Licensing Service Contact with CLS and the Support Service Contract with CMS and paid CORF $250,000 to help him establish two facilities.

**Marc Fournier:**

(13.) At a seminar on or about September 2001, CLS provided Marc Fournier with projections that reflected a CORF licensee could expect yearly billings of $1,050,226 and a net profit of $240,000.

**Mike Zuendel:**

(14.) In or about December 2001, defendant GUENTHER told Mike Zuendel that he had already lined up a group of pulmonologists in Iowa who were "ready, willing and anxious" to sign on as medical directors.

**Michael Foley:**

(15.) In or about February 2002, CLS distributed financial projections to Michael Foley at a seminar that projected yearly collections of $1,030,131 and a net profit of $263,583.

**Tom Harris:**

(16.) In or around March 2002 during the course of a CLS seminar, defendant ROSS told Tom Harris and other attendees that the projections were based on the "worst case scenario."

(17.) Around March 2002, defendant MARSHALL told Tom Harris that his CORF broke even in five months and that he plans to make more than the projections because of the size of his facilities.

(18.) On or about March 2002, defendant MARSHALL told Tom Harris that he was willing to take the time to speak to him and other investors because it gave him the opportunity to network with other CORF owners.

**Carl Betcher:**

(19.) At a seminar sponsored by CLS in or about May 3, 2002, defendant ROSS told Carl Betcher and other attendees that the numbers utilized to arrive at the projections represent the

14

"worst case" scenario.

(20.) In or about May 2002, defendant GOLDFARB arranged for Carl Betcher to talk with defendants BONEBRAKE, ONGARO, NIBLER and MCHALE, all of whom gave glowing testimonials.

(21.) On or about May 10, 2002, defendant BONEBRAKE told Carl Betcher that he had opened the first CORF in January 2001, generated a positive cash flow in 90 days and that by December 2001 he had recouped his entire investment.

(22.) In May 2002, defendant ONGARO advised Carl Betcher that he had opened October 2001 and that it took only six months to breakeven and that he and defendant MARSHALL planned to open 6-8 more CORFs.

(23.) Around May 13, 2002, defendant NIBLER told Carl Betcher that he opened his CORF in September 2001, hit break even by December 2001/January 2002 and was generating a net cash flow of $22,000 a month.

(24.) On or about May 9, 2002, defendant MCHALE told Carl Betcher that he was certified in August 2001, that it took six months to break even and he had exceeded expectations.

(25.) On or about May 22, 2002, Carl Betcher signed a Licensing Service Agreement with CLS and fed-x it along with a check for $165,000 to CLS.

**Stephanie and Duncan McGillivrays:**

(26.) On or about May 17, 2002, the McGillivrays attended a CLS seminar where defendant GOLDFARB told the attendees that CLS had established about 80 CORFs with expected combined earnings of $90 million that could be rolled up and sold to a corporation for multiples of these earnings in the near future.

(27.) At that seminar, defendant ROSS reviewed the projections line by line, stating that he used to use "average" numbers to forecast earnings, but the projections provided the attendees were based on the "worst case" scenario.

(28.) In May 2002, defendant BONEBRAKE told the McGillivrays that for the first five months of 2002 his CORF was significantly ahead of his first year's performance.

15

(29.)  In May 2002, defendant MARSHALL told the McGillivrays that he had signed an agreement with CLS in February 2001 and was Medicare certified in September 2001 and that from October 2001 to May 2002 he averaged 30 patients per week.

(30.)  In May 2002, defendant NIBLER told the McGillivrays that his CORF opened for business September 2001 and that on average it serviced 30 patients per month and that based on his actual performance for the last 8 months he expects to return his original investment of $338,000 in the 14th month plus have $150,000 of billed receivables on the book.

(31.)  On or about September 8, 2002, the McGillivrays attended a meeting in Las Vegas with other disgruntled CORF owners.  At the meeting, defendant BONEBRAKE said his CORF was profitable.

**Ted Buck:**

(32.)  At a seminar held by CLS in or about May 2002, defendant G0LDFARB told Ted Buck and other attendees that it took from 4 to 6 months from the signing of the agreement with CLS to become Medicare certified.

(33.)  At the same seminar, defendant GOLDFARB shared his grand plan to "roll up" and sell the individual CORFs to a buyer at multiples of 6 to 8 times their annual pre-tax cash profits and that the sale would take place when the individual CORFs' combined "pre-tax profits" reached $100 million which he anticipated to occur in 24 to 30 months.

(34.)  Defendant ROSS advised the attendees that the projections represented a "worst case scenario."

(35.)  On or about June 11, 2002, Ted Buck signed a contract with CLS and mailed it fed-x along with a check for $165,000 to CLS.

**Greg Hughes:**

(36.)  CLS conducted a seminar in or about June 2002, during which defendant ROSS told the attendees including Greg Hughes that the pro formas were based on averages of the 50-60 facilities established through CLS and operating.

(37.)  At the same seminar, CLS furnished projections reflecting cash collections of

16

$1,030,131 the first year and a corresponding net profit of $253,380.

(38.) Subsequent to the seminar in June 2002, defendant GOLDFARB refused to provide Greg Hughes with a random list of CORF owners with whom he could speak as part of his due diligence and instead arranged for him to speak with referrals: defendants ONGARO, NIBLER, McHALE and BONEBRAKE.

(39.) On or about June 18, 2002, defendant ONGARO omitted to tell Greg Hughes that he was being compensated by CLS for talking with future CORF owners when Greg Hughes asked him why he would spend  time doing so.

(40.) Around June 18, 2002, defendant NIBLER told Greg Hughes that in his first year to 14 months he had a 100% return of all his capital from the day he had sent his money to CLS, that he had made about $125,000 in net profit and took out a salary of approximately $75,000.

(41.) On or about June 19, 2002, defendant BONEBRAKE told Greg Hughes that he was just shy of getting his investment back the first year but was still profitable.

(42.) On or about June 21,2002, CLS mailed Greg Hughes a letter in which was enclosed Licensing Service and Support Service Agreements for his signature.

**Theodore Goodman:**

(43.)  During a seminar attended by Theodore Goodman on or about July 26, 2002, defendant GOLDFARB set forth CLS's goal of rolling up the individual CORF's (300 CORF's times net income of $300,000 = $90,000,000) and selling it for a multiple of 7 to a private investor.

(44.) At the same seminar in July 2002, defendant ROSS again told Theodore Goodman and the others that the projections represent the "worst case scenario." Projections reflected cash collected in the first year of approximately $1,050,000 and a net profit of $185,000.

(45.)  Subsequent to the seminar and in or about July or August of 2002, defendant NIBLER told Theodore Goodman that he had 32 patients last week and that he was billing $95,000 to $115,000 per month.

(46.) In or about July or August 2002, defendant McHALE told Theodore Goodman that

17

his income had increased each month, it took six months to break even, his CORF was now making $300,000 and that last month's net income was $45,000.

**Seminar:**

(47.) In a seminar sponsored by CLS in or around October 18, 2002, defendant ROSS told the attendees that the projections were based on the "worst case scenario" of expenses and income and GOLDFARB assured them that there was probably over a 90% chance that they would beat the projections.

**Howard Moore:**

(48.) At a seminar held on or about November 21, 2002, CLS provided Howard Moore and the other attendees, projections which reflected cash collections for 18 months of $1,837,482 and a corresponding net profit of $552,261.

(49.) On or about November 25, 2002, defendant ONGARO told Howard Moore that his CORF had been open since September 17, 2001, and it took six months to break even.

(50.) Around November 26, 2002, defendant McHALE told Howard Moore that he had been licensed for a year and that he intended to open three more facilities.

**Paul Colburn:**

(51.) On or about February 14, 2003, Paul Colburn received a letter from CLS with a Licensing Service Agreement enclosed and a request for payment.

**E-MAILS AND CORRESPONDENCE:**

(52.) On or about October 16, 2001, defendant GOLDFARB sent Marc Fournier an e-mail which read in part as follows: "..Though I appreciate your desire to learn as much as you can before making a decision, the fact is, we have only so many owners operational. As I am sure you can imagine, we receive more than 100 calls every week and every person wants to speak with those contracted. These are independent business owners who feel greatly imposed upon to take such calls at all. I therefore do my best to direct qualified persons with several contacts each and no more. The fact is, you would hear virtually the same thing from anyone you speak with."

18

(53.) On or about November 19,2001, defendants ONGARO and MARSHALL sent a letter to GOLDFARB as President of CORF advising him that their "... patient load is far below break even point, and CLS assistance is urgently needed..."

(54.) On or about November 26, 2001, defendant MARSHALL e-mailed defendant GOLDFARB with attached letter of November 25, 2001, which stated "...Our patient count is far below break even...It appears that TTC (Texas Therapy Center) will never meet the model projections from RT and PT revenues alone..." The e-mail was copied to defendant ONGARO.

(55.) On or about December 17, 2001, defendant NIBLER e-mailed defendant ROSS requesting a $30,000 advance against his receivables.

(56.) On or about January 4, 2002, defendant GOLDFARB advised Joel Brill, CEO of CLS, that defendant BONEBRAKE awaits to be advised about position as "...Good Will Ambassador..."

(57.) On or about January 11, 2002, defendant ONGARO states via e-mail, copy to defendant WOODCOCK, that ".. As you know our biggest challenge has been patient flow. After almost 4 months, we still only have 6-7 active patients!..."

(58.) On or about January 21, 2002, defendant McHALE e-mailed defendant ROSS and Joe Brill, CEO of CLS, a spreadsheet reflecting a loss of revenues from January 1, 2001 through December 2001.

(59.) On or about January 24, 2002, defendant McHALE thanked defendant ROSS and Brill by e-mail for the money they wired him and requests financial support for another 90-120 days.

(60.) Around February 5, 2002, defendant GOLDFARB wrote an e-mail to defendant ROSS expressing his frustration with defendant WOODCOCK 's decision to "cut-off" all financial assistance to defendant McHALE.

(61.) On or about February 8, 2002, in response to defendant GOLDFARB's e-mail, defendant ROSS wrote in an e-mail "we paid his payroll Monday we will attempt to finally fix the problem dick r..."

19

(62.) On or about February 5, 2002, defendant GOLDFARB sent Joel Brill, CEO of CLS, an e-mail encouraging him to make defendant MARSHALL feel part of the "inner team" and that "..The Ongaro-Marshall/Nibler/Bonebrake 'triumverate' want to be your eyes and ears. There may be no better time than now to oil the machinery."

(63.) On or about February 10, 2002, Bill Kilgore, an employee of CLS, sent a letter to Joel Brill, CEO of CLS, warning him that defendant ONGARO made threatening statements that it wasn't beyond him to "..fax a detailed statement to all 200+ CLS CORF owners describing all the false promises that CLS has made to he and Ray (MARSHALL)."

(64.) On or about March 8, 2002, defendant GOLDFARB received an e-mail from defendant NIBLER which advised him of his rift with his partner and requested CLS provide him financial assistance in the amount of $100,000. This e-mail was then forwarded to defendant WOODCOCK on or about March 11, 2002.

(65.) On or about April 11, 2002, Bob Bostrom, an employee of CLS, sent Joel Brill an e-mail in which he shares his conversation with defendant BONEBRAKE: "...Jim (BONEBRAKE) is concerned that the number of RT patients is down to 12-they are 'surviving on their PT patients' Last year their RT patient base was 24-30 pts. The number declined over the holidays and has never recovered..."

(66.) On or about May 6, 2002, defendants MARSHALL and ONGARO sent an email with a letter attached to defendants WOODCOCK, GUENTHER, ROSS and GOLDFARB advising them that "...They are running out of time and money, we need your assistance immediately...we have never generated more than about 12 active pulmonary patients at any one time..... We need other revenue sources immediately.....We are down to 7 active patients at this time!...The Medicare/Pulmonary Rehab model that these facilities were designed for is simply not a reality in Texas..."

(67.) Around September 12, 2002, Dana Brock, an employee of CLS, e-mailed Joe Brill and others regarding defendant BONEBRAKE, who had told her that "..They are not sure if they will be able to stay open through October..."

20

**PAYMENTS:**

(68.) On or about June 5, 2002, CLS issued check no. 3037, drawn on CLS's Bank One checking account #XXXX9583, to RMBO, (defendants ONGARO and MARSHALL) in the amount of $60,000.

(69.) On or about June 5, 2002, CLS issued check no. 3038, drawn on CLS's, Bank One checking account #XXXX9583, to defendant BONEBRAKE in the amount of $30,000.

(70.) On or about June 5, 2002, CLS issued check no. 3039, drawn on CLS's Bank One checking account #XXXX9583, to defendant NIBLER in the amount of $15,000.

(71.) On or about June 5, 2002, CLS issued check no. 3040, drawn on CLS's Bank One checking account #XXXX9583, to defendant McHALE in the amount of $12,500.

(72.) On or about July 9, 2002, CLS issued check no. 3279, drawn on CLS 's Bank One checking account #XXXX9583, to defendant BONEBRAKE in the amount of $30,000.

(73.) On or about July 9, 2002, CLS issued check no. 3286, drawn on CLS's Bank One, checking account #XXXX9583, to defendant McHALE in the amount of $12,500.

(74.) On or about July 9, 2002, CLS issued check no. 3289, drawn on CLS's Bank One checking account #XXXX9583,  to defendant NIBLER in the amount of $15,000.

(75.) On or about July 18, 2002, CLS issued check no. 3332, drawn on CLS's Bank One checking account #XXXX9583, to RMBO, (defendants ONGARO & MARSHALL), in the amount of $60,000.

(76.) On or about April 1, 2002, CLS issued check no. 2510, drawn on CLS's Bank One checking account #XXXX9583, to defendant GOLDFARB in the amount of $250,000.

(77.) On or about July 2, 2002, CLS issued check no. 3236, drawn on CLS's Bank One checking account #XXXX9583, to defendant ROSS in the amount of $35,000.

(78.) On or about May 20, 2002, CLS issued check no. 2953, drawn on CLS's Bank One checking account #XXXX9583, to defendant WOODCOCK in the amount of $25,000.

(79.) On or about April 25, 2002, CLS issued check no. 2739, drawn on CLS's Bank One checking account #XXXX9583, to defendant GOLDFARB in the amount of $50,000.

(80.)  On or about April 22, 2003, CLS issued check no. 1207, drawn on CLS' Bank of America checking account #XXXXXX6756, to defendant ROSS in the amount of $18,000.

(81.)  On or about April 29, 2003, CLS issued check no. 1288, drawn on CLS's Bank of America checking account #XXXXXX6756, to defendant ROSS in the amount of $22,000.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 20-27

## PROMOTIONAL MONEY LAUNDERING

The allegations set forth in paragraphs 1- 42 are realleged and incorporated herein.

46.    On the dates set forth below, the defendants GOLDFARB, WOODCOCK, GUENTHER and ROSS, along with defendants BONEBRAKE, MARSHALL, ONGARO, McHALE and NIBLER, as designated below with respect to each count ,within the District of Arizona and elsewhere, knowing that the property involved in the financial transactions set forth below represented the proceeds of some form of unlawful activity, conducted or attempted to conduct such financial transactions affecting interstate commerce, that is the payment for reasons specified below from accounts specified below to individuals and entities specified below, which payments in fact involved the proceeds of an unlawful activity, namely fraud by mail in violation of Title 18, United States Code, Section 1341, with the intent to promote the carrying on of the unlawful activity:

| Count | Date | Amount | Check | Transaction/payee | Reason |
|-------|------|--------|-------|-------------------|--------|
| 20 | 6/5/2002 | $60,000 | 3037 | Check issued from CLS Bank One account #XXXX9583, payable to RMBO (MARSHALL and ONGARO) | Compensation |
| 21 | 6/5/2002 | $30,000 | 3038 | Check issued from CLS Bank One account #XXXX9583, payable to BONEBRAKE | Compensation |
| 22 | 6/5/2002 | $15,000 | 3039 | Check issued from CLS Bank One account #XXXX9583, payable to NIBLER | Compensation |

22

| 23 | 6/5/2002 | $30,000 | 3040 | Check issued from CLS Bank One account #XXXX9583, payable to McHALE | Compensation |
| 24 | 7/9/2002 | $30,000 | 3279 | Check issued from CLS Bank One account #XXXX9583, payable to BONEBRAKE | Compensation |
| 25 | 7/9/2002 | $12,500 | 3286 | Check issued from CLS Bank One account #XXXX9583, payable to McHALE | Compensation |
| 26 | 7/9/2002 | $15,000 | 3289 | Check issued from CLS Bank One account #XXXX9583, payable to NIBLER | Compensation |
| 27 | 7/9/2002 | $60,000 | 3332 | Check issued from CLS Bank One account #XXXX9583, payable to RMBO(ONGARO and MARSHALL) | Compensation |

All in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 2.

## COUNTS 28-33

### MONEY LAUNDERING-TRANSACTIONAL

The allegations set forth in paragraphs 1-42 of the Indictment are realleged and incorporated herein.

47. On or about the dates set forth below, in the District of Arizona, the defendants GOLDFARB, WOODCOCK, ROSS and GUENTHER did knowingly engage and attempt to engage in a monetary transaction by, through or to a financial institution, that is the use of funds contained in the accounts specified below paid to the entities as specified below, which transaction affected interstate commerce and which consisted of criminally derived property of a value greater than $10,000, such property having been derived from an unlawful activity, namely mail fraud in violation of Title 18, United States Code, Section 1341.

| Count | Date | Amount | Check | Transaction |
|-------|------|--------|-------|-------------|
| 28 | 4/1/2002 | $250,000 | 2510 | Check issued from CLS Bank One account #XXXX9583, payable to GOLDFARB |

| 29 | 7/2/2002 | $35,000 | 3236 | Check issued from CLS Bank One account #XXXX9583, payable to ROSS |
| 30 | 5/20/2002 | $25,000 | 2953 | Check issued from CLS Bank One account #XXXX9583, payable to WOODCOCK |
| 31 | 4/25/2002 | $50,000 | 2739 | Check issued from CLS Bank One account #XXXX9583, payable to GOLDFARB |
| 32 | 4/22/2003 | $18,000 | 1207 | Check issued from CLS Bank One account #XXXXXX6756, payable to ROSS |
| 33 | 4/29/2003 | $22,000 | 1288 | Check issued from CLS Bank One account #XXXXXX6756, payable to ROSS |

All in violation of Title 18, United States Code, Section 1957 and 2.

## Forfeiture Allegation #1

48. Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. §2461 and as a result of committing one or more of the offenses charged in Counts 1-20 of this Indictment, the court shall order that the defendants so convicted forfeit to the United States any property, real or personal, constituting, or derived from proceeds obtained directly or indirectly as a result of the said violations, including, but not limited to the following: $30 million in U.S. Currency and all interest and proceeds traceable thereto, in that such sum in aggregate is property which was involved in the aforestated offenses or is traceable to the property, in violation of Title 18, United States Code, §981(a)(1)(C), 28, U.S.C. §2461.

49. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, §981, Title 28, United States Code, Section 2461(c), the defendants shall forfeit substitute property, up to the value of the amount described above if, by any act or omission of the defendant, the property described above, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

24

1  All in violation of Title 18, United States Code, Section 981, United States Code, Section
2  2461(c) and Title 18, United States Code, Section 1341 and Rule 32.2(a), Federal Rules of
3  Criminal Procedure.

4
5
## Forfeiture Allegation #2

6  50.  Pursuant to 18 U.S.C. §982(a)(1) and as a result of committing one or more of the
7  offenses charged in Counts 22-35 of this Indictment, which is incorporated by reference herein,
8  the court shall order that the defendants forfeit to the United States all right, title, and interest in
9  any and all property involved in each offense in violation of Title 18, United States Code,
10  Sections 1956 and 1957, for which the defendant is convicted, and all property traceable to such
11  property, including the following: 1) all money or other property that was the subject of each
12  transaction, transportation, transmission or transfer in violation of Sections 1956 and 1957; 2) all
13  commissions, fees and other property constituting proceeds obtained as a result of those
14  violations; and 3) all property used in any manner or part to commit or facilitate the commission
15  of those violations, including but not limited to the following:

16  A sum of money equal to the total amount of money involved in each offense or conspiracy
17  to commit such offense, for which the defendant is convicted.  If more than one defendant is
18  convicted of an offense, the defendants so convicted are jointly and severally liable for the
   amount involved in such offense.

19  51.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18,
20  United States Code, Section 982(b), each defendant shall forfeit substitute property, up to the
21  value of the amount described above, if by any act or omission of the defendant, the property
22  described above, or any portion thereof, cannot be located upon the exercise of due diligence; has
23  been transferred, sold to or deposited with a third party; has been placed beyond the jurisdiction
24  of the court, has been substantially diminished in value; or has been commingled with other
25  property which cannot be divided without difficulty.

26  All in accordance with Title 18, United States Code, Section 982(a)(1), and Rule 32.2(a),
27  Federal Rules of Criminal Procedure.

28

1

2

3                                              A TRUE BILL

4

5

6                                              S/
                                               FOREPERSON OF THE GRAND JURY
7                                              Date: March 7, 2007

8
    DANIEL G. KNAUSS
9   United States Attorney
    District of Arizona
10

11
    S/
12  STEPHEN W. LARAMORE
    Assistant U.S. Attorney
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    26